Filed 10/16/14

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Butte)

----

| | |
|---|---|
| In re D.H. et al., Persons Coming Under the Juvenile Court Law. | C075278 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JASON H.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. J-33052, J-36726) |

APPEAL from orders of the Superior Court of Butte County, Clare Keithley, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Bruce Alpert, County Counsel; and Kimberly Merrifield for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

1

Jason H. (father) appeals the juvenile court's determination to deny him reunification services with the minors, now 16-year-old D.H. and seven-year-old T.H. The trial court found two reunification bypass provisions applied, that (1) father had previously had reunification services and his parental rights terminated to the minors' half siblings and father had not made reasonable efforts to treat the problems that led to the removal of the half siblings (Welf. & Inst. Code, § 361.5, subds. (b)(10) & (11));[1] and (2) father was incarcerated and the provision of services would be detrimental to the children (§ 361.5, subd. (e)). Father contends these bypass provisions did not apply as he had made reasonable efforts to treat the problems that led to the removal of the half siblings and reunification services were in the minors' best interest; and, it would not be detrimental to the minors for him to be provided reunification services. We agree with father that there is not sufficient evidence to support the finding that he had not made reasonable efforts to treat the problems that led to the removal of the half siblings, because the record before us shows that the problems that led to the removal of the half siblings (unsafe and unhealthy conditions) were different from those presented in this case (alcohol abuse, anger management problems and domestic violence); nor does the record establish any connection between the two sets of problems or even that father received services in the prior case for the problems manifest in the present case. However, we find there was sufficient evidence to support the finding that father was incarcerated and it would be detrimental to the minors to provide services. Accordingly, we shall affirm the orders of the juvenile court.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1997, the minors' half siblings were declared dependents of the court, "as a result of unsafe and unhealthy living conditions." Father did not participate in services and on June 7, 2000, parental rights were terminated.

Father has a history of referrals to children's services including numerous complaints of domestic violence and intoxication. His criminal history goes back to 1995 and includes charges for assault with a deadly weapon, battery, spousal abuse, driving under the influence, and child cruelty. The first report of his being arrested for domestic violence and drunkenness is November 1999. His first conviction for an alcohol-related offense was for driving under the influence in February 2000, followed by another in May 2000. His first conviction for a violent offense was in 1998 and his first arrest for domestic violence was in November 1999. In 2000, he was pending trial for multiple charges of domestic violence and driving under the influence. Allegations of neglect and emotional abuse as to D.H. were substantiated. In 2004, Butte County Department of Employment and Social Services (Department) received a referral that father was drinking alcohol and had been in a car accident with D.H. in the car.

In 2006, the minor D.H. was removed from his parents' home as a result of father's alcohol abuse and domestic violence between the parents. D.H. reported father put him in a room and shot BB's at him, hit D.H. in the head, stomach and arm with his fist, drank beer every night and was mean after drinking the beer. The parents participated in family services and D.H. was returned to their home in November 2007. Dependency was dismissed in December 2008, due to the family's having reached the legal time limits for provision of family maintenance services. The prognosis for the family " 'was poor since neither parent demonstrated a willingness to access resources unless ordered to do so by the court.' "

Throughout 2010 and 2012, D.H. made repeated allegations that father was physically and verbally abusive to him, and had alcohol abuse and anger management problems. D.H. frequently had marks and bruises on his body. D.H. was placed in a plan of legal guardianship with his maternal grandmother in November 2010. The guardianship terminated in January 2012 and D.H. was returned to his parents. In December 2012, mother obtained a restraining order because father had physically abused D.H.

In March 2013, father had returned to the home, despite a safety plan indicating he would not be in the home. D.H. had been suspended from school. He reported he and father had gotten into an argument the night before and father was provoking D.H. to hit him. Father had an extensive criminal history associated with uncontrolled anger impulses. D.H. told a Department worker he was "sure that 'either my father will kill me or I will end up killing my father.' " D.H. and T.H. were detained and placed into foster care.

In April 2013, the Department filed petitions under section 300 alleging father had an alcohol abuse problem that rendered him periodically unable to provide care for the minors and, as a result of his abuse, he becomes violent with D.H. The petitions also alleged that in 1997, the minors' half siblings were declared dependents "as a result of unsafe and unhealthy living conditions. The parents failed to participate and progress in court ordered services and on June 7, 2000, parental rights were terminated and adoption was finalized on December 7, 2000." The juvenile court found the allegations of the petitions true on June 27, 2013.

Upon being interviewed, D.H. reported father was an alcoholic who became abusive to him and mother when father was intoxicated, which is the majority of nights he is in the home. He stated father dared D.H. to hit him and when D.H. does not comply, father physically provokes him. D.H. stated, " 'one of us will be dead one of

these days.' " He reported both he and his younger brother T.H. had witnessed domestic violence by father against mother. T.H. has special needs, as he suffers from a cardiovascular disorder that involves autistic-like characteristics, and heart and breathing problems. He also has significant developmental delays. Based on this information, the juvenile court also issued a protective custody order for the two minors.

The Department placed T.H. and D.H. in separate foster homes. The homes were across the street from each other and the minors had frequent contact with each other.

T.H. had significant health problems and developmental delays. He was described as a happy boy who enjoys playing and has a vivid imagination; however, he also presented as " 'disruptive, defiant, [and] displaying severe signs of Pervasive Developmental Disorder (autism).' " D.H. was physically healthy and was meeting developmental milestones. D.H. had struggled in school and had failed eighth grade for the second time. The Department suspected these struggles were due to the chaos and abuse in his home. D.H. was doing well in his foster home. He had become involved in bicycle motocross (BMX) racing with his foster parent and had won several races and awards. The racing was giving D.H. a way to redirect his past misbehaviors and channel his anger.

Father admitted alcohol was a serious problem for him. He also reported " 'this' is 'all [D.H.'s] fault.' " At the time of the dispositional hearing, father was incarcerated in state prison. The Department recommended father not be provided reunification services. Father did not have visits with the children. He informed the Department he did not want to see D.H. and blamed D.H. for the family's dysfunction. The Department was also concerned about T.H.'s ability to cope with the stress of visits with father at the prison because of the environment.

As a result of his incarceration, father had limited access to services. He was able to participate in occasional Alcoholics Anonymous meetings and church services. The

5

Department had sent him written packets on substance abuse, parenting, anger management, and domestic violence. The Department also gave him permission to complete written assignments and he had done so.

The Department recommended father not be offered reunification services under the bypass provisions of section 361.5, subdivision (b)(10) and (11) (hereafter section 361.5(b)(10) and (11)) and section 361.5, subdivision (e)(1) (hereafter section 361.5(e)(1)). The Department noted the minors' half siblings had been removed from father's home as a result of unsafe and unhealthy living conditions and father failed to participate and progress in court-ordered services. Services were terminated and father's parental rights were also terminated. The Department alleged father had made no effort to mitigate the circumstances which led to the removal of those half siblings, in that he "continues to abuse alcohol, and when intoxicated, physically abuse[s] his girlfriend and children." Furthermore, the Department had received numerous referrals regarding father's alcohol abuse and physical abuse of mother and D.H. Father "has not subsequently made a reasonable effort to treat the problem that led to removal of the half siblings of [T.H. and D.H.] from his care."

The Department also reported on the factors underling a bypass under section 361.5(e)(1). The minors were five and 14 years old in July of 2013. T.H. did not speak of his father. D.H. had expressed anger and stated he did not want to see father. Father also did not want to see D.H. D.H. did not want to reunify with father. Father was sentenced to four years in prison. The maximum reunification period would end on October 16, 2014. It was unlikely father would be released from prison with adequate time to address his alcohol addiction and anger management problems before that date. The Department noted father's extensive history of alcohol abuse, domestic violence, lack of impulse and anger control, and abuse of his children. It stated father "first came to the attention of Children's Services in 1997 and services to address these issues were

6

provided to him at that time. [Father] failed to attend, participate or progress in those services." He had also participated in both probation and parole services, and received services in 2006 to address domestic violence and alcohol abuse. Despite all of these services, he continued to engage in alcohol abuse and violence toward mother and D.H. Based on this history, the Department concluded father had been unable or unwilling to address his severe and chronic alcohol addiction or manage his anger. The Department concluded there would be no detriment to the children if reunification services were not provided to father. Mother was being offered and actively engaging in services.

Father testified at the contested dispositional hearing. As to the termination of his parental rights to the minors' half siblings, he testified that his parental rights had been terminated in June 2000; he had only one driving under the influence arrest since 2000; and he was arrested in 2009 and 2010 for disorderly conduct, which were alcohol related. He claimed he had made reasonable efforts to address his alcohol problem through outpatient rehabilitation programs from 2011 to 2012. He had also attended Alcoholics Anonymous meetings, and was completing his Life Recovery Bible workbook.

As to any detriment to his children, father testified that he and T.H. had a "tremendous bond." He would take him to the park and his mother's home and on Easter egg hunts. He testified he was scheduled to be released from prison in June 2014 and then planned to be released to a live-in rehabilitation treatment program. He acknowledged his relationship with D.H. was "rocky." He had last seen both boys in April 2013, some six months earlier.

The social worker testified that father's convictions for driving under the influence occurred in February and May of 2000, prior to the termination of his parental rights to the half siblings, and that there was only one driving under the influence conviction since that termination, in October 2003. It was her understanding that many of father's

7

convictions involved alcohol.[2] She did not believe father's participation in the Butte County rehabilitation program constituted reasonable efforts to address his alcohol problems because he had not remained clean and sober, continued to perpetuate domestic violence, and had multiple arrests. When asked if providing reunification services to father would be a detriment to the minors, she answered, "I don't know that I would call it a detriment. But there would be a concern about [father] being able to follow through with his plan of sobriety and follow through with his, with the plans that he has for his life, and the children being anxious and let down again if he's unable to. So that is, that is a concern. [¶] [D.H.], this is his third time in foster care. You know, I would be very concerned with him and, you know, the lasting emotional effects of being let down again." She went on to agree it would be beneficial to D.H. if his father could get and stay clean and sober. Upon further questioning about whether providing reunification services to father would be detrimental to the minors, the social worker opined, "I think my concerns remain the same. The anxiety, the fear, being let down again. [T.H.] in particular, he's very cognitively delayed. He's a very sensitive child. And there's definitely a concern of, you know, the potential for relapse and what may happen to [T.H.]" As to D.H., "Again, I think it's the same. You know, he's been let down so many times that there's a mistrust there and there's anxiety. And my fear is every time he gets his hopes up and then is let down, there's just a little bit more anger, a little bit more resentment, a little bit more emotional trauma. And I just, you know, fear for his emotional being overall." She expressed additional concern that if father again failed in services, it could lead to "[D.H.] again being let down and having the emotional crisis and depression and all the things that go along with that." She had the same concerns,

---

[2] The social worker testified this belief was based on police reports. She indicated she had provided copies of these police reports as part of the discovery packet. Those reports are not contained in our record on appeal.

8

albeit on a different level, for T.H. In addition, D.H. was not willing to engage in reunification services with father.

Counsel for the minors also reported D.H. was playing football. Although he had received a failing grade for speed reading, his grades were "okay." D.H. indicated he wanted to visit with his father because he had some questions for him. D.H. also told the social worker he wanted a DNA test because he wanted to know if father was biologically his father.

After considering the testimony and the Department's reports, the juvenile court adopted the findings and orders of the disposition report. The court found father's progress in alleviating the causes necessitating placement of the minors was poor. He did not take responsibility for the removal, but blamed D.H. The court found that the bypass provisions of section 361.5(b)(10) and (11) applied, in that father's parental rights to half siblings had previously been terminated and he had not made reasonable efforts to treat the problems that led to the removal of the half siblings. The court also found the provisions of section 361.5(e)(1) applied in that father was incarcerated and the provision of services would be detrimental to the minors. The court considered the children's ages and their relationship with father—in particular, that the relationship with D.H. reflected a long history of aggression and violence. D.H. refused to see father until recently and had suffered academically, failing eighth grade. Father had an early release date from prison, but would be going to necessary residential treatment upon his release and it was unknown "what the length and nature of that treatment will be." Moreover, the juvenile court found it did not have persuasive evidence that father would be released from the Department of Corrections and Rehabilitation during a period of time in which services would be effective. The juvenile court considered the nature of father's current conviction that involved both violence and alcohol. The juvenile court also considered D.H.'s attitude, and the medical status and fragility of T.H. These factors led the court to

conclude the provision of services would be detrimental to the minors. Accordingly, the court denied father reunification services.

## DISCUSSION

### I. Section 361.5(b)(10) and (11)

Father contends the trial court erred in denying him reunification services under section 361.5(b)(10) and (11) on the basis that he had not made reasonable efforts to treat the problems which led to the removal of the minors' half siblings and that services were in the minors' best interests. Father contends there is no evidence that alcohol or domestic violence led to the removal of the half siblings. But he details the services he participated in to address his substance abuse problems, including attending a rehabilitation program from 2011 to 2012, attending Alcoholics Anonymous meetings while in prison, reading packets provided by the social worker on substance abuse, parenting, anger management and domestic violence, and satisfactorily completing the homework assignments from those packets.

When a child is removed from the parent's home, reunification services may be offered to the parent, " 'in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.] Section 361.5, subdivision (b) sets forth certain exceptions—also called reunification bypass provisions—to this 'general mandate of providing reunification services.' " (*In re Allison J*. (2010) 190 Cal.App.4th 1106, 1112.)

Section 361.5(b)(10) and (11) "authorize the denial of services to a parent who has failed to reunify with another child or whose parental rights to another child were terminated if the court finds that the parent 'has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . .' " (*R.T.*

10

*v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*).)  An order denying reunification services is reviewed for substantial evidence.  (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)  We agree the record in this case does not contain substantial evidence to support the trial court's denial of services on the basis that father had not made reasonable efforts to treat the problems which led to the removal of the minors' half siblings.

To be perfectly clear, this is not a determination on our part that father made reasonable efforts to address his alcohol abuse or domestic violence problems.  "We do not read the 'reasonable effort' language in the bypass provisions to mean that any effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable.  It is certainly appropriate for the juvenile court to consider the duration, extent and context of the parent's efforts, as well as any other factors relating to the quality and quantity of those efforts, when evaluating the effort for reasonableness.  And while the degree of progress is not the focus of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the reasonableness of the effort made.  [¶]  Simply stated, although success alone is not the sole measure of reasonableness, the measure of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable."  (*R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915, italics omitted.)  Father's history as to both the quality and quantity of his efforts, as well as the lack of progress and success, provide ample evidence to support the conclusion that he has not made reasonable efforts to address those problems.

Instead, the insufficient evidence here relates to the "problems that led to removal of the . . . half siblings."  (§ 361.5(b)(10) & (11).)  The record reflects only that the half siblings were removed because they were living in "unsafe and unhealthy conditions";

11

those problems were not addressed in the case with the half siblings, and parental rights were terminated. The record does not, however, reflect that those unsafe and unhealthy conditions were caused by father's alcohol use, anger management problems or domestic violence—the problems that led to D.H.'s and T.H.'s removal. The record does not contain the case plan for the half siblings' 1997 dependency case. The record does not contain any report of specific services provided to father in the context of that case. Nor is there any indication in the record that father had an alcohol abuse problem in 1997. The first indications of problems with alcohol in the record before us are the driving under the influence charges in 2000. These offenses occurred shortly before parental rights to the half siblings were terminated, but well after their removal from the home. Similarly, the first indication of a problem with violence is an offense in 1998, and another domestic violence offense in November 1999. As with the alcohol offenses, these occurred prior to the termination of parental rights to the half siblings but after their removal from the home. Moreover, there is no indication in the record that father received services for his alcohol abuse, anger management problems, or domestic violence in the half siblings' case. The record does reflect that the minors in the current case have been removed from the home previously because of father's problems with alcohol abuse, anger management and domestic violence, and that father has repeatedly received services for those problems and has been unsuccessful in remedying them. But the problems that led to the prior removal of these minors and father's failure to benefit from the provision of services in prior cases involving these minors is not the issue under these bypass provisions. The issue is the problems that led to the removal of the half siblings—unsafe and unhealthy living conditions. On this record, we cannot find there is substantial evidence that the bypass provisions of section 361.5(b)(10) and (11) apply. [END OF PUB. PT. I.]

12

## II.  Section 361.5(e)(1)*

Father also contends there was not sufficient evidence to support the trial court's finding that providing reunification services would be detrimental to the minors.  He rests his claim on his good relationship with T.H., the need to repair the relationship with D.H., and the fact that mother was granted reunification services.  On this point, we are not persuaded.

Section 361.5(e)(1) provides, in relevant part, "If the parent or guardian is incarcerated, . . . the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child.  In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors."

Section 361.5(e)(1) "reflects a public policy favoring the development of a family reunification plan even when a parent is incarcerated."  (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011-1012.)  Here, at the time of the disposition, D.H. and T.H. were 14 and five years old, respectively.  They had been detained in April 2013 and had not seen father since that time.  The maximum statutory period for reunification services was 12 months or October 2014.  Father was not expected to be released from prison until June 2014, and then would remain in a live-in rehabilitation treatment program.  Although, according to father, T.H. had a pleasant relationship with father, T.H. never spoke of father.  D.H.'s relationship with father was filled with violence and

---

* See footnote, *ante*, page 1.

13

abuse. Father continues to blame D.H. for the family's dysfunction and their involvement with the Department, and did not want to see D.H. While living with father, D.H. got suspended from school, twice failed eighth grade, and ran away from home. His academic failures were attributed to the chaos and abuse in his home when living with father. Since being removed from father, and having no contact with him at all, D.H.'s behavior and grades have improved, he is winning races and awards in BMX racing, and more appropriately channeling his anger. For most of these proceedings, D.H. affirmatively refused to see father. D.H. did not want to reunify with father and did not want him to receive services. Father's criminal record includes charges for assault with a deadly weapon, battery, spousal abuse, driving under the influence, and child cruelty. He has repeatedly engaged in domestic violence in front of both children. The social worker testified both children would be emotionally harmed by father's participation in services, and would likely suffer anxiety, increased anger, and emotional trauma. Father's further failure in services could also lead to the minors' suffering an emotional crisis and depression. Based on this record, the juvenile court's orders denying reunification services grounded on section 361.5(e)(1) are supported by substantial evidence.

## DISPOSITION

The orders of the juvenile court denying father reunification services are affirmed. (*CERTIFIED FOR PARTIAL PUB.*)


                                             BUTZ            , J.

We concur:


     ROBIE          , Acting P. J.


     MURRAY        , J.

14