Filed 9/22/15  In re Giovanni D. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re GIOVANNI D., a Person Coming Under the Juvenile Court Law. | B262788 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO D.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK08977) |

APPEAL from an order of the Superior Court of Los Angeles County.  Philip Soto, Judge.  Affirmed.

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, Tracey M. Blount, Deputy County Counsel, for Plaintiff and Respondent.

_____

Father Alberto D. challenges a juvenile court order denying him family reunification services. We affirm the order.

### FACTUAL AND PROCEDURAL BACKGROUND

In late 2014, 12-year-old Giovanni D. was living with his mother, Constanza O., his 17-year-old sister, Crystal O., Crystal's husband, and the maternal grandmother.[1] Father had been in prison since 2009. Mother had a history of substance abuse and had in the past left Giovanni without support. According to the reports of the Los Angeles County Department of Children and Family Services (DCFS), the maternal grandmother was at one time Giovanni's legal guardian. The reports do not explain when or how the guardianship terminated. Giovanni also lived with a maternal aunt in Virginia for a year and a half. He returned to California in April 2014.

Giovanni had been diagnosed with ADHD and ADD. He was prescribed medication for both conditions, and saw a therapist and psychiatrist. The maternal grandmother told DCFS Giovanni had been placed on a psychiatric hold earlier in the year because every time he became upset he threw things around the house. Mother informed DCFS the previous hold was in August 2014, after Giovanni threatened to kill her.

In November 2014, Giovanni became upset with mother because he suspected her of drinking and feared she would leave him. He screamed and threw things; threw his telephone and broke it; and tried to take mother's phone. Giovanni then placed mother in a headlock, choking her in the process. Mother bit and scratched him. Giovanni subsequently grabbed a knife and poked holes in the wall. He also banged his head against a wall and suggested he would seriously injure himself. Crystal called the police. Giovanni was briefly held in a psychiatric hospital after the incident. DCFS became involved.

---

[1] Crystal turned 18 in December 2014.

2

In mid-December 2014, mother left the home without informing her family members of her whereabouts. Giovanni was left with Crystal and the maternal grandmother. Mother had Giovanni's prescription medication and left without providing Crystal with authorization to refill the prescription. As a result, Giovanni was unable to take his medication. Mother had started using methamphetamines in October 2014. In late December, while "using on the streets," mother suffered a drug-related heart attack. Eventually mother gave Crystal a letter giving her temporary custody of Giovanni. Mother admitted to DCFS that she was unable to care for Giovanni. She wanted him to stay with Crystal. In January 2015, the juvenile court detained Giovanni.

DCFS interviewed father for a February 2015 jurisdiction and disposition report. The report noted father had a long criminal history involving charges for drug possession, theft, and residential burglary. He admitted to using methamphetamines before he was arrested in 2008. Although father was scheduled to be released from prison in October 2015, he informed DCFS that he was facing deportation upon his release. He intended to challenge the deportation. He had not seen Giovanni since 2008. Father had no knowledge of the allegations in the dependency petition. However, he believed the maternal grandmother and Crystal had cared well for Giovanni, and he wanted Giovanni to stay with them. Giovanni told DCFS he had not had any direct contact with father for around eight years. Crystal was committed to keeping Giovanni with her. She indicated Giovanni had behavior issues, "especially anger issues," but he was loving and respectful with her and the maternal grandmother. DCFS recommended the court deny father reunification services. Mother was by this time in custody, awaiting criminal proceedings.

At the February 2015 jurisdiction hearing, mother pleaded no contest to a dependency petition containing allegations that her drug use, her failure to regularly provide Giovanni with his daily medication, and her failure to make appropriate plans for his care, placed him at risk of harm within the meaning of Welfare and Institutions Code

3

section 300, subdivision (b).[2] The juvenile court found Giovanni to be a person described by the statute. Regarding disposition, father asked that Giovanni be released to him, with the understanding that his plan would be to have Giovanni stay with Crystal. The court rejected the request, finding it would be detrimental for Giovanni to be placed with father. Father alternatively requested reunification services, arguing there was no basis to deny them. Giovanni's counsel agreed there was no basis to deny father reunification services. However, when the court asked Giovanni's counsel if a visit with the parents could be arranged after that day's hearing, counsel informed the court that Giovanni did not wish to visit either parent. The court continued the disposition hearing to allow DCFS to determine if there were services that would be appropriate to try to reunify father with Giovanni.

In a subsequent interview with DCFS, Giovanni indicated he lived with father between the ages of three and five.[3] He remembered only that father was nice. He had not seen father since 2008, when he was five years old. DCFS reported: "Giovanni . . . further stated that he is not interested in having visits or living with his father since he does not have a relationship with his father, and is not sure if he is ready to establish a relationship with his father since it had been a long time since they talked or had direct contact."

Father told DCFS that when he was released in October 2015, he would most likely be deported to Mexico, although he intended to fight the deportation. If he was deported he would temporarily reside in Tijuana, but he might move somewhere else in Mexico. Father said he first needed to stabilize his living situation "to determine if [he] could take care of Giovanni." He admitted Giovanni had no relationship with him. He had lived with Giovanni and mother the first two years of Giovanni's life, until father went to jail in 2002. Upon his release in 2004, father lived with Giovanni and mother briefly before returning to jail that same year. He was released in 2006, and lived with

---

[2]     All further statutory references are to the Welfare and Institutions Code.

[3]     By the time of the report, Giovanni was two months away from his 13th birthday.

4

Giovanni and mother for two more years before again being incarcerated. Father thought substance abuse programs, parenting classes, and counseling might be available to him in prison, however he noted: "[A]t this time I think I need to regain my son Giovanni's trust and reestablish a relationship." Father had asked Giovanni to write to him, but it appeared to father that Giovanni was too overwhelmed. He intended to start writing to Giovanni and progress to telephone conversations until his release. He was willing to participate in counseling sessions with Giovanni, or to submit to drug testing in California or in Mexico.

At the continued disposition hearing in March 2015, Giovanni's counsel indicated his client had no desire to reunify with father, had no relationship with father, and did not want to visit with father. Still, counsel supported giving father reunification services, on the theory that since mother was to receive services, the same should be provided to father who, unlike mother, had a release date from prison. The juvenile court denied father's request for reunification services, pursuant to section 361.5, subdivision (e). Among other things, the court noted it was not clear father would be able to avoid deportation. Giovanni did not want to see father, which, the court noted, would make it very difficult to effectuate visitation. The court concluded there was no reasonable hope services would lead to reunification with father. Father's counsel confirmed with the court that it was making a detriment finding by clear and convincing evidence.[4]

Father's appeal followed.

---

[4]     The juvenile court responded to father's counsel's question about clear and convincing evidence by stating: "True, by clear and convincing evidence leads me to believe that it's a detriment for the child to be returned to the father." Although the court mentioned placement, it had already made a placement finding at the previous hearing, and the sole purpose of the March proceeding was to determine whether father would receive reunification services. It thus appears the juvenile court intended to refer to reunification services, not placement. Father does not argue on appeal that the court failed to apply the clear and convincing evidence standard to the detriment finding.

## DISCUSSION

### The Juvenile Court Did Not Err in Denying Father Reunification Services

On appeal, father contends the juvenile court erred in denying reunification services on the ground that they would be futile, rather than that the services would be detrimental. Father further argues there was no substantial evidence of detriment. We disagree.

### A. Substantial Evidence Supported the Juvenile Court's Detriment Finding

Under section 361.5, subdivision (a), when a child is removed from the parent's home, reunification services generally must be offered to the parent, " ' "in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]" [Citations.]' " (*In re D.H.* (2014) 230 Cal.App.4th 807, 815 (*D.H.*).) Section 361.5 also applies when, as in this case, a noncustodial parent is denied custody of the child under section 361.2, subdivision (b). (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 54, 59.)

Under section 361.5, subdivision (e)(1):

"If the parent or guardian is incarcerated, institutionalized, or detained by the United States Department of Homeland Security, or has been deported to his or her country of origin, the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration, institutionalization, or detention within the reunification time limitations described in subdivision (a), and any other appropriate factors. In determining the content of reasonable services, the court shall consider the particular barriers to an incarcerated, institutionalized, detained, or deported parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan."[5]

---

[5]     The statute also provides that reunification services may include the maintenance of contact between parent and child through telephone calls, transportation and visitation

6

Substantial evidence supported the juvenile court order denying father reunification services on the ground that such services would be detrimental to Giovanni. (*D.H., supra*, 230 Cal.App.4th at p. 815; *In re James C.* (2002) 104 Cal.App.4th 470, 484 (*James C.*).) Giovanni was almost 13 years old and had last had direct contact with father when he was only five years old. He had no relationship with father, was at best unsure if he wanted a relationship with father, and affirmatively refused to have any contact with father. He did not wish to visit father. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691 [visitation is an essential component of a family reunification plan].) Although father was scheduled for release in less than one year, he acknowledged that he would likely be deported. He also acknowledged he had no relationship with Giovanni.

Thus, father was essentially a stranger to Giovanni. He had been absent for approximately two-thirds of Giovanni's life, due to repeated incarcerations and a lack of contact with Giovanni during those periods of incarceration. (*In re James C., supra*, 104 Cal.App.4th at pp. 485-486 [lack of parent-child relationship was evidence supporting denial of reunification services to incarcerated parent].) Giovanni was opposed to having any contact with father. Father admitted that his situation would be uncertain for some time to come, suggesting that while he would be released approximately four months before the end of the 12-month reunification period (§ 361.5, subd. (a)(1)(A)), a return of Giovanni to father's custody would not be possible for some time even after father's release from prison. Further, there was evidence in the record regarding Giovanni's extreme response to the instability caused by mother's conduct, indicating his need for stability and permanence. The lack of a parent-child relationship, Giovanni's opposition to having any contact with father, Giovanni's age, and his documented emotional or

services where appropriate, and reasonable services to those providing care for the child. In addition, the incarcerated or detained parent may be required to attend counseling, classes, or other programs if "actual access" to such services is provided. (§ 361.5, subd. (e)(1).)

7

behavioral issues, supported the juvenile court's determination that providing reunification services to father would be detrimental to Giovanni.

We further disagree that the juvenile court erred in finding detriment based on the likely futility of reunification services. The record indicates the juvenile court explicitly considered factors specifically identified in section 361.5, subdivision (e)(1) to determine detriment, including the degree of parent-child bonding and Giovanni's attitude toward the implementation of family reunification services. In addition, section 361.5, subdivision (e)(1) directs the court to consider "any other appropriate factors" in determining detriment. Father has pointed to no authority for the proposition that a juvenile court may not consider the likelihood that reunification efforts will fail as one appropriate factor in determining whether providing such services would be detrimental to the child.[6]

*In re Kevin N.* (2007) 148 Cal.App.4th 1339, 1344, does not require a contrary result. In *Kevin N.*, the juvenile court concluded that even if the incarcerated father received 18 months of reunification services, providing them would be futile because he would be released only one month before the reunification period ended. The juvenile court denied reunification services on that basis alone. The court of appeal reversed and remanded, explaining the juvenile court had not found providing reunification services would be *detrimental* to the children. The juvenile court had never addressed detriment. (*Id.* at pp. 1344-1345.) In contrast, here the juvenile court considered the detriment to Giovanni in providing father reunification services, not only due to the likelihood

---

[6]     Indeed, in *Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, the court agreed with the reasoning of a respected dependency treatise in its conclusion that in some cases, providing reunification services to an incarcerated parent who will not be released before the end of the reunification period, or who does not have access to rehabilitative services, results in services that have little or no likelihood of success, "and thus only serves to delay stability for the child." (*Id.* at pp. 1030-1031.) In such cases, it may be that "providing services to the incarcerated parent would be detrimental to the child since it would delay permanency with no likelihood of success." (*Id.* at p. 1031.)

services would fail to reunify father and Giovanni, but also Giovanni's opposition to contact with father and the lack of any parent-child relationship. Substantial evidence supported the detriment finding.

## DISPOSITION

The juvenile court order is affirmed.


BIGELOW, P. J.

We concur:


RUBIN, J.


FLIER, J.