Filed 12/14/20  Natasha J. v. Superior Court CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| NATASHA J., | B303115 |
| Petitioner, | (Los Angeles County Super. Ct. No. 19CCJP02504A) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for extraordinary writ, Craig S. Barnes, Judge.  Petition denied.

Patricia K. Saucier, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and William T. Thetford, Deputy County Counsel for Real Party in Interest.

_____

Natasha J. (Mother) purports to appeal the order of the juvenile court denying her reunification services with her infant son K.J. on the ground the evidence was insufficient to establish the applicability of Welfare and Institutions Code[1] section 361.5, subdivision (b)(10). We construe the appeal as a petition for extraordinary writ and deny the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

I.    **2012 Dependency Proceeding**

On July 3, 2012, Mother's two sons, S.B. and T.R., were eight years old and five years old, respectively. The Department of Children and Family Services (DCFS) received a referral when Mother was found by law enforcement punching S.B. after he accidentally started a backyard fire. The home was filthy, with dirty clothing everywhere and a butcher knife on the floor. Mother, who had suffered from bipolar disorder and schizophrenia since she was a child, admitted she had not been taking her prescribed medication at the time of the incident: "I wasn't taking them obviously and that's why I'm here; I wasn't taking my meds." DCFS removed the children from Mother's custody. Mother was arrested and was later convicted of willful cruelty to a child.

_____

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

2

DCFS filed a petition alleging the children were subject to juvenile court jurisdiction under section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), and (g) (children left without means of support). The petition contained five allegations involving Mother: she physically abused S.B. by kicking him, punching him, and banging his head against a counter; she suffered from schizophrenia and bipolar disorder, impairing her ability to parent her sons; her substance abuse problem impaired her ability to parent her sons; she engaged in domestic violence with her boyfriend in front of the children; and Mother was incarcerated with an unknown release date. The juvenile court found true all allegations of the petition.

The children received reunification services from July 2012 to July 25, 2013, but Mother refused to participate. The status review report for the July 25, 2013 hearing read, "Mother was offered Court Family Reunification Services, but mother reported, 'I do not want to participate in reunification services because it is too difficult.' While mother had phone contact and face to face contact with her children, mother was non-compliant to services and was unable to reunify with her children." Reunification services were terminated on July 25, 2013, at the 12-month review hearing, and the children were placed in legal guardianships with an extended family member in November 2013.[2]

---

[2] The record lists two dates for the termination of reunification services: July 25, 2013 (the date of the 12-month review hearing), and February 26, 2014. As the court selected a permanent plan of legal guardianship in November 2013, we conclude the earlier date is correct.

## II.    Present Dependency Proceeding

Mother gave birth to K.J. in March 2019.  A few days later, Natasha underwent a mental health examination and was diagnosed with bipolar disorder and schizophrenia.  On April 9, 2019, K.J. suffered a seizure and stopped breathing; he was hospitalized overnight.  On April 10 or 11, 2019, a nurse following up on Mother's mental health with a home visit found Mother had not been taking her psychotropic medications and was suicidal.  A psychiatric mobile response team was called, but Mother was not hospitalized.  Mother failed to bring K.J. to his post-hospitalization follow-up appointment on April 18, 2019.  The hospital attempted to contact Mother because K.J. needed medical attention, but she did not respond.  On April 18, 2019, DCFS received a referral regarding Mother's untreated mental health problems and her failure to secure medical care for K.J.

That day, Mother sent a text message to her oldest son in which she said "the best thing I can do is give up [K.J.] until I get back on track with God and myself."  She told her sister she was going to the police station to surrender K.J.  A cousin, C.T., assumed care of K.J. when Mother attempted to relinquish him to the police.  Mother was detained by the police, and when interviewed she told DCFS she had known she had a warrant for her arrest and had turned herself in because it was her best safety plan for K.J.  She did not want to "walk around the streets with" K.J. knowing she would be detained, and she had hoped to avoid DCFS involvement.

DCFS interviewed Mother on the day she turned herself in.  Mother said she was on parole after four years of incarceration.  She had been in a residential facility where she received drug testing and classes, but she left the program in violation of her

4

parole because her doctor had recommended she live elsewhere but her parole officer would not permit her to leave the facility. Mother said she was homeless, unable to sleep, and depressed because she was "set up to fail." She had bipolar disorder, schizophrenia, and depression. She attributed her mood instability to a lack of family support but also disclosed she had discontinued her mood-stabilizing and anti-anxiety medications because they made her too sleepy to care for K.J. Mother denied suicidal thoughts but told DCFS she claimed to be suicidal so she could get help and stay in different facilities. Mother denied wanting to relinquish K.J. due to suicidal thoughts or mental health issues.

Mother disclosed K.J.'s father had pushed her while she was pregnant, causing her to fall and be hospitalized with vaginal bleeding. She attributed the earlier dependency proceeding to domestic violence, stating her older sons had been removed from her custody because of an incident of violence with another man. She reported one of her older sons "set their house on fire because he did not know how to deal with the domestic violence." Mother denied using corporal punishment but said the police had detained her because they believed she had hit her son.

When DCFS expressed concern about Mother's ability to care for K.J., she began to scream and cry. She screamed she did not want to fight anymore and would not listen to the social worker.

Mother had told her case worker at her residential facility she wanted to give up the baby. Joyce C., the older boys' legal guardian, told DCFS Mother had shown up at her home a few days earlier and wanted her to take custody of K.J. She had

appeared confused and uncertain what to do with the baby. C.T. also advised DCFS Mother had tried to give up her older children too, and earlier DCFS referrals included multiple reports of Mother failing to return after leaving the older boys with others. C.T. told DCFS she did not believe Mother could care for K.J. due to her mental health problems.

Mother's parole officer told DCFS she had been placed at the Female Offender Treatment and Employment Program in August 2018. She tested negative for drugs while she was there. Mother was required to attend classes and a clinic for mental health treatment. Mother was noncompliant with her services and left the facility without permission in November 2018, ultimately leading to the issuance of a warrant for her arrest. The parole officer's primary concerns were Mother's housing instability, her financial instability, and no management of her mental health.

DCFS took one-month-old K.J. into custody and filed a petition on April 22, 2019, alleging he came within the jurisdiction of the juvenile court under section 300, subdivisions (a), (b)(1), and (j) (abuse of sibling). DCFS alleged Mother and K.J.'s father[3] engaged in domestic violence, endangering K.J.; Mother had paranoid schizophrenia, bipolar disorder, depression and suicidal ideation, and failed to take prescribed psychotropic medication, rendering her unable to provide K.J. with regular care and supervision; Mother had failed to obtain necessary follow-up care for K.J. after he was hospitalized for a seizure disorder and apnea and diagnosed with a heart murmur; Mother

---

[3] The alleged father did not participate in the proceedings in juvenile court and is not a party to this appeal.

had requested K.J. be removed from her care, and she was unable and unwilling to provide for him; and Mother's other children had been juvenile dependents who received permanent placement services due to Mother's mental health problems.

DCFS believed continued detention of K.J. was necessary because Mother had turned herself in without making appropriate plans for his care, she failed to obtain medical care for K.J., she was not taking her prescribed psychotropic medication, and her older children had been "removed from her care and custody as a result[] of [her] inability to manage her mental health."  Mother had been "provided Court Family Reunification services with concerns for prior substance abuse, mental health, and domestic violence and Mother was unable to reunify with her children as she was non-compliant with services."

In April 2019, Mother was hospitalized for mental health treatment and stabilization, and she was released in May 2019 to a crisis residential treatment program for continued treatment, observation, and stabilization.  In a June 2019 DCFS interview, Mother denied domestic violence during her pregnancy and said K.J.'s father had not pushed her; she fell on her own.  She disclosed she had been diagnosed with bipolar disorder, paranoid schizophrenia, depression, and suicidal ideation at the age of 13.  She was angry at DCFS because she felt she was being judged for her mental health problems.  The social worker explained that mental health issues are not necessarily a concern, but untreated mental health issues are.  Mother insisted she had always treated her mental health issues, but provided no information when asked for treatment details, instead accusing DCFS of

exacerbating her mental health problems by removing her older children from her care.

Mother denied receiving reunification services during her older sons' dependency proceedings, said DCFS did not help her, and announced she would not speak further with DCFS. She maintained her history was irrelevant, but the social worker explained it was relevant because she had not complied with services in the past and the present allegations were similar to those made before. Mother became enraged and told the social worker she planned to focus on herself and would not fight with DCFS about K.J. She said DCFS could have K.J.

In May 2019, Mother began working with a therapist; the therapist told DCFS Mother wanted to reunify with her children. After Mother moved to another facility in June 2019, she told DCFS she would no longer go to court because she would have to get up early, which was "not fair" to her. When DCFS attempted to arrange visitation, Mother said she no longer wanted contact with K.J. or DCFS. Mother, however, did continue visiting K.J. weekly.

At the jurisdictional hearing in October 2019, the juvenile court dismissed the allegation under section 300, subdivision (j) and sustained the four subdivision (b)(1) allegations that Mother's mental health problems and failure to take medication rendered her unable to provide regular care and supervision; she had failed to obtain necessary follow-up medical care for K.J. after his hospitalization and diagnosis; she had requested K.J. be removed from her care and was unable and unwilling to provide

8

care and supervision to him; and she had engaged in violent altercations with the alleged father.[4]

Mother did not appear for the dispositional hearing in November 2019. DCFS argued reunification services should not be provided pursuant to section 361.5, subdivision (b)(10) because Mother had received reunification services for, but failed to reunify with, her older sons, and she had not made reasonable efforts to address the issues that had led to the removal of the other children. Specifically, DCFS argued Mother's mental health problem was one of the reasons the older children had been removed, and her untreated mental health issues were a primary reason for the present dependency proceedings. There was no evidence Mother had addressed her mental health problems, and she just became upset when asked what mental health care she had received.

K.J.'s counsel joined in DCFS's request for denial of reunification services, noting there was "really just no evidence" Mother had made any changes since the earlier dependency proceedings. Mother's counsel agreed her mental health had "always" been the main issue. She asked the court to consider Mother's residence at a mental health facility since June 2019 a sufficient showing she had been trying to address the mental health problems "that have brought her here several times."

The court found by clear and convincing evidence reunification services had been terminated for K.J.'s siblings and Mother had not made a reasonable effort to treat the problems that had led to the boys' removal. The court denied reunification

---

[4]     The court also sustained allegations as to the alleged father.

services and set a permanency planning hearing pursuant to section 366.26.

Mother filed a notice of appeal.

## DISCUSSION

Mother purports to appeal the denial of family reunification services. Orders made at a hearing at which a permanency planning hearing is set are not appealable and must be challenged by a petition for extraordinary writ. (§ 366.26, subd. (*l*)(1).) If a party is not present at the hearing where the permanency planning hearing is set, the court clerk is required to give notice of the requirement the orders be challenged by writ petition. (*Id*., subd. (*l*)(3)(A)(ii); Cal. Rules of Court, rule 5.590(b)(2).) The record does not contain evidence the clerk mailed a writ advisement to Mother. Accordingly, we treat Mother's appeal as a petition for extraordinary writ. (*Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 671; *Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 260.)

The juvenile court is required to order family reunification services unless a statutory exception applies. (*In re Albert T*. (2006) 144 Cal.App.4th 207, 217 (*Albert T*.).) The relevant exception here is set forth in section 361.5, subdivision (b)(10): Reunification services need not be provided to a parent when the court finds, by clear and convincing evidence, that "[t]he court ordered termination of reunification services for any siblings or half-siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . and that parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal."

10

Mother argues the evidence is insufficient to support the court's determinations she received reunification services with respect to her older sons, she failed to reunify with them, and her services were terminated. We review a finding that a fact has been proven by clear and convincing evidence to determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

Mother first contends DCFS failed to prove she, as opposed to her sons or their father, received family reunification services. She notes DCFS's detention and jurisdictional/dispositional reports in the present case stated the children received family reunification services and did not specifically state she received reunification services or her services were terminated because she failed to reunify with the children. She also complains DCFS did not provide supporting documentation regarding the 2012 dependency proceedings, "such as minute orders or case plans, reflecting any reunification services Mother was ordered to undergo, Mother's progress with services or whether Mother's services were terminated because she failed to make progress." However, the evidence was sufficient to permit the court to conclude by clear and convincing evidence Mother declined the reunification services offered to her in the earlier dependency proceeding involving her older sons. The status report for the

11

July 2013 12-month review hearing stated, "Mother was offered Court Family Reunification Services, but mother reported, 'I do not want to participate in reunification services because it is too difficult.' While mother had phone contact and face to face contact with her children, mother was non-compliant to services and was unable to reunify with her children." Reunification services were terminated at the 12-month hearing, and the children subsequently were placed in a legal guardianship with an extended family member. Consistent with this evidence, DCFS reported to the juvenile court in the present case that in the earlier dependency proceedings Mother "ultimately . . . did not comply with services, resulting in mother not reunifying with her children." This evidence was sufficient to permit the juvenile court to conclude under the clear and convincing evidence standard that the court ordered termination of Mother's reunification services for the older children because she failed to reunify with them after they were removed from her custody. (§ 361.5, subd. (b)(10).)

Mother also contends DCFS failed to establish by clear and convincing evidence she had not subsequently made reasonable efforts to treat the problems leading to the removal of K.J.'s siblings. However, Mother acknowledged her longstanding mental health problems to DCFS, telling the social worker she had been diagnosed with paranoid schizophrenia, bipolar disorder, depression, and suicidal ideation at the age of 13. She had previously admitted the incident leading to her older children's removal happened because she had stopped taking her medications, and she reported her mental health problems had worsened since that time. When Mother was released on parole in 2018, she was placed in a residential facility where she was

12

required to attend classes and an outpatient clinic for her mental health treatment. The parole officer had no information about Mother's participation in mental health treatment while she was at the facility, but the facility reported Mother was noncompliant with services, and she soon left the program without permission. As of March 2019 she was noncompliant with her prescribed psychotropic medications and acknowledged discontinuing them. Mother failed to appear for her psychiatric appointment on April 8, 2019. A nurse went to the home a few days later and found Mother suicidal and not taking her medications. Recognizing the severity of her untreated mental health problems, Mother had reported to family members she was depressed. She told the police she was not fit to be a parent when she attempted to relinquish K.J., and she also told her oldest son the best thing she could do was to give up K.J. until she could "get back on track." On this evidence the juvenile could conclude by clear and convincing evidence Mother had had not made reasonable efforts to treat the problems that led to the removal of K.J.'s siblings.

As Mother points out, there was evidence she began receiving mental health services after K.J. was detained from her. However, she fails to explain how her six months of services, beginning only after K.J. was removed from her custody, establish the evidence was insufficient to support the juvenile court's conclusion or constituted reasonable efforts to treat the problems that had resulted in the removal of her older children seven years before. (See *R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 ["It is certainly appropriate for the juvenile court to consider the *duration, extent, and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort

13

for reasonableness.  And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made"].)

Mother likens the instant matter to *Albert T.*, contending that in both cases DCFS failed to prove the parent had not made reasonable efforts to address the problems that led to removal. In *Albert T.*, the juvenile court failed to make a finding the mother had not made a reasonable effort to treat the problem that led to the child's removal; there was no evidence that the problem the mother allegedly had not addressed had been the basis for removal of the sibling; and there was evidence the mother had completed numerous court-ordered and voluntary services designed to address the problem.  (*Albert T.*, *supra*, 144 Cal.App.4th. at pp. 218–221.)  Here, unlike in *Albert T.*, the court expressly found the requirements of section 361.5, subdivision (10) were met, so we are not asked to imply a finding; additionally, the evidence before the court indicated Mother had failed to treat her worsening mental health problems, left a residential program that provided mental health services, and discontinued her prescribed psychotropic medications.

Relying on *In re D.H.* (2014) 230 Cal.App.4th 807, Mother argues there was no evidence what services, if any, were provided in the earlier dependency matter, and therefore no way for the juvenile court to determine "whether Mother had repeatedly received services for the same problems and been unsuccessful in remedying them."  In *In re D.H.*, however, the problem the father had failed to address was not the problem that had led to the children's removal in the earlier matter.  (*Id.* at p. 816.)  That is not the case here.  Mother's untreated mental health problems

14

were one of the reasons for the older siblings' removal from the home.  In both the 2012 and 2019 dependency proceedings Mother admitted she had not been taking her psychotropic medications at the time of the incidents prompting DCFS intervention.  As Mother's counsel said at disposition, "[T]he main issue in this case has always been Mother's mental health," and her mental illness was "the issue that ha[s] brought her here several times."  The court specifically found at the jurisdictional hearing, in a finding Mother has not challenged, the older siblings "received permanent placement services due to the mother's mental and emotional health."  In this context, more detail about the services offered to Mother years earlier would have been of limited utility given her total refusal of services and the passage of time.  Mother's ongoing, escalating mental health problems and continued failure to take her medication in 2019 are much more relevant in establishing the reasonableness of her efforts to address the problems that led to the older boys' removal than are more details about the services she declined in 2013.  The evidence was sufficient to support the denial of reunification services.

## DISPOSITION

The petition for extraordinary relief is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:


BIGELOW, P. J.


WILEY, J.


16