# IN THE SUPREME COURT OF CALIFORNIA

In re Z.G. et al.,
Persons Coming Under the Juvenile Court Law.

SAN BERNARDINO COUNTY CHILDREN AND FAMILY
SERVICES,
Plaintiff and Respondent,
v.
A.G.,
Defendant and Appellant.
S289430

In re A.G. on Habeas Corpus.
S289441

Fourth Appellate District, Division Two
E083710, E084563

San Bernardino County Superior Court
J286808, J289966

April 27, 2026

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Evans, and Baltodano[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

In re Z.G.[*]

S289430


Opinion of the Court by Liu, J.


In these consolidated cases, the juvenile court terminated a mother's parental rights as to her two children after finding they were likely to be adopted. It is undisputed that the mother received statutorily guaranteed reunification services as to one child and that she did not receive reunification services as to her other child. Her trial counsel did not assert her statutory right to such services at the disposition hearing where the juvenile court terminated services and set a permanency planning hearing. After the mother filed a notice of intent to challenge that outcome, her trial counsel did not prosecute the challenge.

We hold that a juvenile court may not terminate parental rights merely by finding a likelihood of adoption. Further, we conclude that the trial counsel here provided ineffective assistance of counsel by not asserting the mother's statutory right to services as to one of her children and by failing to challenge the termination of services and setting of the permanency planning hearing. We reverse and remand.

**I.**

This case comes to us from dependency proceedings involving two children. "Dependency proceedings span up to four stages: jurisdiction, disposition, reunification, and permanency. [Citations.] At the jurisdictional stage, the

_____

[*] Consolidated with *In re A.G.* (S289441).

1

juvenile court determines whether to declare a child a dependent of the court because the child is suffering, or at risk of suffering, significant harm. [Citation.] At the dispositional stage, the court decides if the child can be returned to, or must be removed from, a parent's custody. [Citations.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624, fn. omitted (*Michael G.*).)

The final two stages, reunification and permanency, are at issue here. "During the reunification stage, qualifying parents are offered services to address the causes that led to the loss of custody." (*Michael G.*, *supra*, 14 Cal.5th at p. 624.) These reunification services " ' "implement 'the law's strong preference for maintaining the family relationships if at all possible.' " ' " (*Ibid.*) "When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52 (*Celine R.*).) If reunification services are ineffectual, then the court moves to the next stage by " 'terminat[ing] reunification efforts and set[ting] the matter for a hearing pursuant to [Welfare and Institutions Code] section 366.26.' " (*Ibid.*; all undesignated statutory references are to the Welfare and Institutions Code.)

At the permanency stage, the court "either terminates parental rights and places the child up for adoption or it selects another permanent plan, such as placement with a guardian or in long-term foster care." (*Michael G.*, *supra*, 14 Cal.5th at p. 624.) The permanency planning hearing, sometimes called a section 366.26 hearing, is "designed to select and implement a permanent plan for the child." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 304 (*Marilyn H.*); see *Celine R.*, *supra*, 31 Cal.4th at pp. 52–53.) At this final stage of the dependency process, "the question before the court is decidedly not whether the parent

may resume custody of the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Ordinarily, when the hearing is set, "reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*)

This case began in late September 2020, when San Bernardino County Children and Family Services (the Department) received a referral that a four-month-old infant, Z.G., was in an emergency room and tested positive for methamphetamine. A few days later, the Department filed a dependency petition against Z.G.'s mother (Mother) alleging that Z.G. was at risk of harm because Mother abused illegal substances and left Z.G. with a caretaker who also abused substances. (See § 300, subd. (b).) The petition also alleged that there was domestic violence by Mother and Z.G.'s father (Father), that Father did not protect Z.G. despite Mother's substance abuse, that Father abused substances, and that Father's whereabouts were unknown. (The Department later concluded the allegations of domestic violence and Father's purportedly unknown whereabouts were unsupported by evidence.)

In October, the juvenile court ordered Z.G. detained outside her parents' custody. As the disposition hearing approached, the Department recommended formal removal with reunification services. The Department suggested that the parents' substance abuse and history of substance abuse in their families impaired their decisionmaking, and that the parents had left Z.G. with unfit caretakers. The Department's proposed case plan urged Mother and Father to access resources and meet Z.G.'s needs, to arrange appropriate childcare when they were away from home, to develop positive support systems, and to

stay clean of illegal substances. The juvenile court agreed and removed Z.G. while observing that both parents had "cooperated with initial services ordered at detention" and had "made progress in alleviating the problems." The court ordered reunification services.

Some months later, it appeared the situation had improved. In April 2021, the Department recommended Z.G.'s return to Mother and Father's custody, noting that Mother planned to cut contact with relatives given their continued substance abuse. Unsupervised visitation had been ongoing for several months, and both parents had engaged with their case plans: They took anger management and parenting classes, received therapeutic services, engaged in individual counseling, attended Al-Anon group meetings, and tested negative for drugs. "The concerns that led to placement," the Department informed the juvenile court, "do not currently exist." Echoing that assessment, the juvenile court at the six-month review hearing (see § 366.21, subd. (e)) observed that Mother's and Father's progress "toward alleviating or mitigating the causes necessitating placement has been substantial." It ordered Z.G.'s return to parental custody.

Three months later, in July 2021, a second dependency proceeding began. Earlier that month, Mother and Father had a second child, A.G. The Department sought to declare A.G. a dependent, and it also filed a subsequent petition as to Z.G. (See § 342.) While the Department stated that Mother "has been proactive in getting her services and children's needs met" and had negative drug tests, the Department raised concerns about alleged domestic violence and substance abuse by Father.

At the subsequent hearing on the children's detention, counsel for the minors remarked that Mother "has made some very good efforts to keep the children safe," and the court ordered the children to be maintained with Mother. A few weeks later, in August, the juvenile court, following the Department's recommendation, removed both children from Father but ordered that they remain in Mother's custody. Again, counsel for the children noted that Mother was "doing a good job in keeping the kids safe."

Over the next months, Mother's and Father's trajectories continued to diverge. The Department remained concerned about potential domestic violence and substance abuse by Father, and he fell out of contact with the Department. Mother maintained a safe and clean house; completed her counseling and domestic violence classes in accordance with her case plan; continued to test negative for substances; developed a support network; and left her relationship with Father. In April 2022, the juvenile court, following the Department's recommendations, terminated reunification services as to Father and kept both children with Mother supported by family maintenance services.

In the fall of 2022, the Department asserted Mother had not shown up for several drug tests, although Mother claimed she was testing. The Department later acknowledged providing "misinformation" on Mother's drug test record and concluded that Mother had tested negative 28 times. Meanwhile, Z.G. was diagnosed with a heart issue, and both the Department and the children's attorney sought to continue the juvenile court's oversight of Mother to ensure adequate medical care for Z.G.

By the new year, the Department had decided to recommend dismissing the cases. It had "no concerns that [M]other has relapsed or cannot maintain custody of the children," and the Department further verified that Mother had attended Al-Anon, "tested clean for the past two years," completed individual counseling, took her domestic violence classes, and otherwise completed her case plan. Indeed, Mother "expressed her frustration that the case is still open when she has completed the case plan," and the Department "d[id] not see that keeping the case open is benefitting her or the children."

But soon after, in March 2023, the Department filed supplemental petitions for both children under section 387. On a supplemental petition, the court proceeds by first setting an adjudicatory hearing to determine if the allegations in the petition are true; if it sustains the petition, it then sets a disposition hearing. (See Cal. Rules of Court, rule 5.565(e); *In re D.D.* (2019) 32 Cal.App.5th 985, 990.) Here, the Department alleged in its petition that Mother was no longer cooperating with her case plan or testing for drugs, that she had lost her housing, and that she was no longer in contact with the Department. The court detained the children and issued protective custody warrants; it subsequently sustained the allegations in the petition. The children had been in Mother's custody for over 18 months, since August 2021, before they were detained.

In April 2023, the Department recommended removing the children. The Department concluded that Mother was no longer cooperating with the case plan and had stopped consistently testing, and the Department's social workers noted allegations that Mother was drinking. The Department also

became concerned with Mother's health after she was hospitalized.

Ordinarily, when a child is removed, a parent is statutorily entitled to reunification services for a set duration of time. (See § 361.5, subd. (a); *Michael G.*, *supra*, 14 Cal.5th at p. 625.) These services begin after the disposition hearing. (§ 361.5, subd. (a)(1)(A)–(B).) Here the disposition hearing on the supplemental petitions occurred in May 2023. At that point, Mother had not yet received reunification services as to A.G.; indeed, the Department's original recommendation was to order services upon removing the children. But at the hearing, the juvenile court terminated reunification services for both children and set a permanency planning hearing. In its submission to the court, the Department recognized that "[M]other is willing to do her case plan" and that Mother and the children "have a strong bond." But it said that "legally [M]other's services are to be terminated." Before terminating reunification services, the juvenile court asked, "Isn't the mother out of time statutorily for services to be provided?" The Department's attorney answered in the affirmative. Mother's counsel requested continued reunification services but did not provide any reasons. He also did not challenge the Department's assertions.

Two weeks after the hearing, Mother filed a notice of intent to file a writ petition to contest this result. However, her trial counsel concluded there were no appealable issues and never filed a brief. As a result, Mother defaulted on her writ petition. (See *In re Z.G.* (Jan. 15, 2025, E083710) [nonpub. opn.] (*Z.G.*).) The children were placed with relatives in late June 2023, and those foster parents eventually decided to seek adoption.

A permanency planning hearing took place in April 2024. After a 26-minute hearing, the court concluded the children were likely to be adopted and terminated Mother's parental rights as to both children. Mother filed a notice of appeal that day. In addition, her appellate counsel filed a petition for a writ of habeas corpus in August 2024.

The Court of Appeal affirmed the termination of Mother's parental rights. Acknowledging that Mother never received reunification services for A.G., the Court of Appeal reasoned that the juvenile court at the section 366.26 hearing was not required to find that Mother received reunification services or that bypass of such services was appropriate. (*Z.G.*, *supra*, E083710.) It declined to evaluate Mother's attack on the setting of the section 366.26 hearing, concluding that it lacked jurisdiction because Mother appealed only the order terminating parental rights rather than the order removing the children and setting the hearing. (*Z.G.*, *supra*, E083710.) Furthermore, it affirmed the juvenile court's conclusion that the beneficial parental relationship exception did not apply. (*Ibid.*; see § 366.26, subd. (c)(1)(B)(i).) The Court of Appeal also summarily dismissed Mother's habeas corpus petition. (*In re A.G.* (Jan. 15, 2025, E084563) [nonpub. opn.].)

Justice Menetrez dissented. He would have concluded that Mother received ineffective assistance of counsel because counsel failed to argue that Mother was entitled to reunification services as to A.G. and because counsel failed to file a writ petition to challenge the termination of Mother's services and the setting of the section 366.26 hearing. (*Z.G.*, *supra*, E083710 (dis. opn. of Menetrez, J.); *In re A.G.*, *supra*, E084563 (dis. opn. of Menetrez, J.).)

Mother filed a timely petition for review in this court. We granted review to decide whether parental rights can be terminated pursuant to section 366.26, subdivision (c)(1) when a parent did not receive reunification services and was not bypassed for such services. In addition, we ordered Mother to file and serve her amended habeas corpus petition before this court, and we consolidated review of that petition with her direct appeal.

## II.

We begin by addressing the juvenile court's judgment terminating Mother's parental rights as to both Z.G. and A.G. Mother contends that at a section 366.26 hearing, a juvenile court may terminate parental rights only when it finds both that the dependent child is likely to be adopted and that there is a sufficient basis for terminating parental rights, as defined by statute. The Department disagrees, contending that if the juvenile court finds that adoption is likely, it is "required to terminate parental rights" unless a statutorily defined exception applies. We agree with Mother and hold that a likelihood-of-adoption finding is not sufficient under section 366.26 to terminate parental rights.

At the time of the setting of the section 366.26 hearing, as well as at the hearing itself, subdivision (c)(1) provided (with sentences numbered for ease of reference): "[1] If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. [2] The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that

it is not likely the child will be adopted. [3] A finding under subdivision (b) or paragraph (1) of subdivision (e) of Section 361.5 that reunification services shall not be offered, under subdivision (e) of Section 366.21 that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or contact the child for six months, or that the parent has been convicted of a felony indicating parental unfitness, or, under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent or guardian and has terminated reunification services, shall constitute a sufficient basis for termination of parental rights. [4] Under these circumstances, the court shall terminate parental rights unless either of the following applies . . . ." (Stats. 2022, ch. 870, § 2.) This language is followed by subdivision (c)(1)(A), which provides for placement with a relative who is willing to serve as a legal guardian, and by subdivision (c)(1)(B), which lists several grounds on which the court may find "a compelling reason for determining that termination would be detrimental to the child."

We refer to the first finding ("that it is likely the child will be adopted") as the likelihood-of-adoption finding; the other findings (the text between "[a] finding under subdivision (b) or paragraph (1) . . ." and ". . . has terminated reunification services") as the additional findings; and the language at the end ("unless either of the following applies") as the exceptions.

**A.**

The Department directs us to the first sentence of section 366.26, subdivision (c)(1): If the court finds that "it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." In the Department's

view, the additional findings are "simply additional means" to justify termination, but they are not necessary conditions for terminating parental rights.

This argument does not pass muster when reading subdivision (c)(1) in its entirety. For one thing, while the Department is correct that the first sentence appears to make a likelihood-of-adoption finding a sufficient condition for termination, the Department concedes that the exceptions qualify the directive in the first sentence. In other words, the Department agrees and courts have uniformly held that even after making a likelihood-of-adoption finding, a juvenile court shall not terminate parental rights if any of the exceptions applies. (See, e.g., *Celine R.*, *supra*, 31 Cal.4th at pp. 53–54 [sibling relationship exception]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1343, 1351–1352 [parental benefit exception], disapproved of on other grounds in *Caden C.*, *supra*, 11 Cal.5th 614; *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773 [same]; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 [sibling relationship and parental benefit exceptions].) This cuts against a literal reading of the first sentence in isolation. Moreover, under the Department's reading, it is not clear what purpose the additional findings serve. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1027 [" '[T]he Legislature is not presumed to use statutory language in a sense which would render nugatory . . . important provisions of a statute.' " (italics omitted)].)

Further, the Department's position is at odds with other parts of section 366.26 and fundamental precepts of the dependency system. The Department contends a juvenile court must terminate parental rights upon a likelihood-of-adoption finding even if the parent was never given reunification services or bypassed. However, in addition to the exceptions to

termination set forth in section 366.26, subdivisions (c)(1)(A) and (c)(1)(B), subdivision (c)(2)(A) commands that the court "shall not terminate parental rights" if, among other conditions, "[a]t each hearing at which the court was required to consider reasonable efforts or services, the court has found that reasonable efforts were not made or that reasonable services were not offered or provided." That reflects how, as Mother's briefing states, reunification services are at the "heart of the dependency system." (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [§ 366.26 must be read "in the context of the entire dependency process of which it is part"].) The Legislature declared that its "intent" in establishing the dependency system was to "preserve and strengthen a child's family ties whenever possible"; thus, "[f]amily reunification services shall be provided for expeditious reunification of the child with his or her family, as required by law." (§ 16000, subd. (a).) " 'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." ' " (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.) Reunification services are one of the "[s]ignificant safeguards . . . built into the current dependency scheme" that balance a parent's right to "due process and fundamental fairness while also accommodating the child's right to stability and permanency." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 307.) We decline to interpret the statute in a way that permits the termination of parental rights absent reunification services.

## B.

The Department points to changes to section 366.26, subdivision (c)(1) over time to bolster its interpretation. It notes

that the court in *In re DeLonnie S.* (1992) 9 Cal.App.4th 1109 (*DeLonnie S.*) held that section 366.26 at the time required the juvenile court both (1) to conclude that the child is likely to be adopted and (2) to make one of the additional findings listed in order to terminate parental rights. (*DeLonnie S.*, at p. 1113.) According to the Department, the Legislature subsequently abrogated the holding of *DeLonnie S.* by deleting certain "conditional language" that connected the likelihood-of-adoption finding to the additional findings, thereby rendering the likelihood-of-adoption finding sufficient for termination of parental rights.

Our review of the legislative history indicates that two amendments to section 366.26 — one in 1998 and another in 2007 — are potentially relevant here. However, neither has the import that the Department suggests.

In 1998, the Legislature enacted Assembly Bill No. 2310 (1997–1998 Reg. Sess.). (Stats. 1998, ch. 572, § 1, pp. 3825–3832.) As a result of this legislation, subdivision (c)(1) omitted language that existed at the time of *DeLonnie S.* — specifically, the phrases "only if," "[i]f the court so determines," and "shall then constitute" — which had connected the likelihood-of-adoption determination to the additional findings. (Compare Stats. 1998, ch. 572, § 1, pp. 3825, 3826–3827 with *DeLonnie S.*, *supra*, 9 Cal.App.4th at p. 1113, fn. 4 [excerpting statute].)

But we are doubtful that the Legislature intended these omissions to alter the relationship between the likelihood-of-adoption determination and the additional findings. The primary change to subdivision (c)(1) worked by Assembly Bill No. 2310 (1997–1998 Reg. Sess.) was the addition of what is now the second sentence: "The fact that the child is not yet placed in

a pre-adoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted." (Stats. 1998, ch. 572, § 1, pp. 3825, 3826.) The first bill analysis after the amendment that authorized this language noted a concern that juvenile courts were refusing to terminate parental rights until there was an identifiable prospective adoptive family. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2310 (1997–1998 Reg. Sess.) as amended June 24, 1998, p. 2.) But adoptive families did not want to commit to adopting unless the child was "legally free" out of concern that they might subsequently lose custody. (*Ibid.*) To help "end this vicious circle," the new language clarified that juvenile courts may make a likelihood-of-adoption finding even if the child was "not yet placed in a pre-adoptive home []or with a relative or foster family who is prepared to adopt the child." (*Ibid.*)

The Legislature inserted the new sentence in subdivision (c)(1) between the likelihood-of-adoption language and the additional findings. It appears that the drafters excised the phrase "If the court so determines" because that phrase would not have sensibly followed the new sentence. There is no indication in the legislative history that this deletion was intended to abrogate *DeLonnie S.*, which was decided six years earlier. Such a substantive change would have had major effects and likely would have been controversial or at least notable. The other changes to subdivision (c)(1) in 1998 were grammatical and nonsubstantive.

Indeed, reading the 1998 amendment as the Department suggests would have created other difficulties. After the amendment, section 366.26, subdivision (c)(1) provided that if a court concluded the child was likely to be adopted, the court

"shall terminate parental rights and order the child placed for adoption." (Stats. 1998, ch. 572, § 1, pp. 3825, 3826.) The statute then stated that any of the additional findings "shall constitute a sufficient basis for termination of parental rights *unless the court finds* that termination of parental rights would be detrimental to the child because of one or more of the following circumstances . . . ." (*Id.* at pp. 3826–3827, italics added.) As evident in the italicized phrase, the provision for exceptions was part of the sentence on additional findings in this version of the statute. If the 1998 amendment made the likelihood-of-adoption finding sufficient to terminate parental rights without regard to the additional findings, then the exceptions provision would have been inapplicable in such cases. Yet courts interpreting the post-1998 statute regularly examined the exceptions after the juvenile court made a likelihood-of-adoption finding. (See *ante*, at p. 11.)

Further, the Department's view would imply that a juvenile court, applying the statute after the 1998 amendment, could have concluded that a child is likely to be adopted and ordered termination of parental rights, even though termination "would be detrimental to the child" under subparagraph (A), (B), (C), or (D) of subdivision (c)(1). (Stats. 1998, ch. 572, § 1, pp. 3825, 3827.) The statute addressed this situation in subdivision (c)(4), which is triggered "[i]f the court finds that . . . termination of parental rights is not in the best interests of the minor, because one of the conditions in subparagraph (A), (B), (C), or (D) of paragraph (1) . . . applies." (*Id.* at p. 3828.) Then-subdivision (c)(4) did not order termination of parental rights; instead, it ordered legal guardianship or long-term foster care. (*Ibid.*) The Department's reading of the 1998 amendment would thus render the statute internally inconsistent. In sum, the

Legislature's change to subdivision (c)(1) in 1998 did not abrogate the holding of *DeLonnie S.*

The Legislature again changed subdivision (c)(1) in 2007 by enacting Senate Bill No. 703 (2007–2008 Reg. Sess.). (See Stats. 2007, ch. 583, § 28.5, pp. 5090, 5091–5092.) As a result, that subdivision had the same structure it has today: It stated in separate sentences that the court "shall terminate parental rights and order the child placed for adoption" upon a likelihood-of-adoption finding; that the additional findings each "shall constitute a sufficient basis for termination of parental rights"; and that "[u]nder these circumstances, the court shall terminate parental rights unless" certain exceptions apply. (*Id.* at p. 5091.) The primary change relevant here was the rewriting of the exceptions provision, which was part of the sentence on additional findings after the 1998 amendment (". . . unless the court finds . . ."), into a separate concluding sentence that begins with "Under these circumstances . . . ." This change alleviated the internal inconsistency in the 1998 statute that the Department's reading would compel.

The changes to section 366.26 in Senate Bill No. 703 (2007–2008 Reg. Sess.) "incorporate[d] amendments" proposed by Assembly Bill No. 298 (2007–2008 Reg. Sess.). (Stats. 2007, ch. 583, § 37, p. 5111; compare § 28.5, pp. 5090, 5091–5092, with § 28, pp. 5079, 5080–5081.) Assembly Bill No. 298, in turn, proposed the modifications to the exceptions provision's language. (See Stats. 2007, ch. 565, § 4, pp. 4573, 4575.) Before these changes, the exceptions provision of subdivision (c)(1) provided that the additional findings "shall constitute a sufficient basis for termination of parental rights unless the court finds a compelling reason for determining that termination would be detrimental to the child"; the statute then

listed various circumstances that constitute detriment to the child. (See Assem. Bill No. 298 (2007–2008 Reg. Sess.) as introduced Feb. 9, 2007, § 4.) Against this backdrop, Assembly Bill No. 298 addressed the treatment of relatives serving as permanent caregivers and created a new exception to termination of parental rights where the child was living with a relative who could be a legal guardian even if the court did not find "a compelling reason for determining that termination would be detrimental to the child." (*Ibid.*) As explained in the first bill analysis, the purpose of the proposal was to "[p]rovide[] support and priority" for relatives able to serve as legal guardians. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 298 (2007–2008 Reg. Sess.) as amended Mar. 15, 2007, p. 1.)

To accomplish this change to the exceptions, the drafters removed the former exceptions language in the sentence on additional findings ("unless the court finds [detriment to the child]"), ended the sentence on additional findings, and then provided: "Under these circumstances, the court shall terminate parental rights unless either of the following applies: [¶] (A) The child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child. [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [then listing circumstances that constitute detriment to the child]." (Assem. Bill No. 298 (2007–2008 Reg.

17

Sess.) as introduced Feb. 9, 2007, § 4.) We see no indication that the Legislature, in making this change, intended to alter the relationship between the likelihood-of-adoption finding and the additional findings.

In sum, we hold that a juvenile court at a section 366.26 hearing may terminate parental rights only when it makes both a likelihood-of-adoption determination and one of the additional findings referenced in section 366.26, subdivision (c)(1). And if the juvenile court finds one of the exceptions in subdivision (c)(1) applicable, it may not terminate parental rights even when it has found a likelihood of adoption and one of the additional findings.

## C.

The Department says any error here is harmless because reunification services as to A.G. could have been bypassed under section 361.5, subdivision (b)(10)(A), which provides that the court may decline to order reunification services when it determines, by clear and convincing evidence, that a parent failed to reunify with a sibling or half sibling after receiving reunification services and has "not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling." The parties agree that a reasonable probability test applies for assessing whether the violation of section 366.26 was harmless. Assuming without deciding that the parties are correct, we apply the test here.

The Department asserts that reunification services for A.G. could have been bypassed because Mother had not "made a reasonable effort to treat the problems that led to the removal of Z.G." (See § 361.5, subd. (b)(10)(A).) According to the Department, the juvenile court's "willingness to 'terminate'

Mother's services for A.G. demonstrates a significant likelihood that the court would have" ordered bypass. We disagree. Before the disposition hearing, the Department represented that "legally" Mother was ineligible for continued services, and the court confirmed its understanding at the hearing by asking, "Isn't the mother out of time statutorily for services to be provided?" The court made no comments about Mother's efforts to treat the problems that led to Z.G.'s removal. The record contains no indication, and the Department has not cited any, that the juvenile court terminated reunification services for any reason other than a misunderstanding of Mother's situation with respect to A.G. We conclude it is not reasonably probable that the trial court would have found, by a clear and convincing standard, that Mother did not make a "reasonable effort" to treat the problems that led to Z.G.'s removal. (§ 361.5, subd. (b)(10)(A).)

Nor do we think there is substantial evidence in the record to support a bypass of reunification services. Although the trial court did not address the issue, it is contested before this court, its resolution turns entirely on the factual record before us, it was addressed in the Court of Appeal, and leaving it undecided could further delay permanent placement of the children in these proceedings. In such circumstances, the trial court does not appear "better positioned" to address the issue than this court. (*Truck Ins. Exchange & Kaiser Cement & Gypsum Corp.* (2024) 16 Cal.5th 67, 101; cf. *ibid.* [remand order to Court of Appeal with "discretion to make a further remand . . . if it concludes that the trial court is better positioned" to address certain issues].)

As noted, the relevant statute allows bypass of reunification services as to one child if a parent has not "made a

reasonable effort to treat the problems that led to removal of" the child's sibling. (§ 361.5, subd. (b)(10)(A).) In their briefing, Mother and the Department agree that for purposes of the "reasonable effort" analysis, courts must consider the "entire time span" between the child's initial removal from parental custody and the dispositional hearing at which the Department would have denied Mother reunification services. (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1274 (*Jayden M.*).) We assume without deciding that the relevant timeframe is the entire period between Z.G.'s initial removal and the May 2023 dispositional hearing.

Z.G.'s removal was initially motivated by concerns about substance abuse in the family and Mother and Father leaving Z.G. with untrustworthy caretakers. From the first dispositional hearing, the juvenile court acknowledged that the parents had "cooperated with [the] initial services" and "made progress in alleviating the problems." At the six-month review, the Department recommended Z.G.'s return to Mother and Father's custody, noting they had engaged with their case plans such that "[t]he concerns that led to placement do not currently exist." The juvenile court described their progress toward alleviating the problems that led to Z.G.'s removal as "substantial." The children ultimately remained with Mother for over a year and a half. The Department's social workers noted she had "tested clean for the past two years" in February 2023; from Z.G.'s first removal in late October 2020 until June 2022, Mother tested negative for drugs at least 24 separate times and positive once. She completed counseling, took domestic violence classes, attended Al-Anon group meetings, and completed a case plan. She exited her relationship with Father, whose substance abuse and threats of domestic violence

were the primary basis for the Department's supplemental petition as to Z.G. and initial petition as to A.G.

The Department points to the events leading up to the juvenile court terminating reunification services. According to the Department, in the months before March 2023, Mother stopped cooperating with her case plan. She lost stable housing, fell out of contact with the Department, stopped testing for drugs, and experienced poor health. We do not understand the Department to argue, however, that Mother's housing insecurity or hospitalization could be a basis for bypassing reunification services; these were not allegations in the Department's original dispositional report seeking Z.G.'s removal, so they were not "problems that led to removal of" Z.G. (§ 361.5, subd. (b)(10)(A); see *In re D.H.* (2014) 230 Cal.App.4th 807, 816–817.)

Rather, the Department argues Mother "relapsed and continued to abuse substances and place her children in danger." The record is mixed on whether Mother began to abuse alcohol or substances again, but it does show that Mother stopped regularly testing in the middle of 2022. The record also contains allegations of Mother drinking again and suggestions that Mother's declining health may have been linked to use of alcohol. But even if Mother relapsed, that would not preclude a finding that she made a reasonable effort to address the problems that led to Z.G.'s removal. The question is not whether Mother " 'cure[d]' " any substance abuse issue; it is whether she "made reasonable efforts to treat it." (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 (*Renee J.*); cf. *In re B.E.* (2020) 46 Cal.App.5th 932, 941 ["[R]elapse is a normal part of recovery. In other words, a relapsed parent is far from hopeless. It is decidedly *not* fruitless to offer services to a parent who genuinely

21

made an effort to achieve sobriety but slipped up on the road to recovery."].)

In assessing reasonableness, we consider "the duration of the parent's effort," the " 'extent and context' " of the parent's effort, and "other factors related to the 'quality and quantity of those efforts.' " (*Jayden M.*, *supra*, 93 Cal.App.5th at p. 1276.) Although Mother's efforts in the months leading up to March 2023 may seem insufficient standing alone, her overall efforts throughout the two-and-a-half-year span of this case were not "lackadaisical or half-hearted." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 99.) She was demonstrably sober for over a year and a half; she completed her initial case plan, including participating in all mandated substance abuse treatment services; and she had custody of Z.G. and safely cared for her for over 18 months. Even in May 2023 when the Department recommended termination of services, it noted that Mother was still "willing to do her case plan" and that she had a "strong bond" with both children. Even if Mother's conduct was inadequate leading up to the dispositional hearing, we reject the "selective hindsight" of focusing exclusively on those months; the question is whether, "consider[ing] all of her conduct," she made reasonable efforts. (*Renee J.*, *supra*, 96 Cal.App.4th at p. 1464, italics omitted.) Viewing the record as a whole, we are unable to find substantial evidence demonstrating to a clear and convincing standard that Mother did not make a reasonable effort to address the problems that led to Z.G.'s removal.

## D.

Our holding is sufficient to reverse the Court of Appeal's judgment affirming the juvenile court's termination of Mother's

parental rights over A.G. However, Mother argues that the order terminating her parental rights as to Z.G. should also be reversed because there would be "substantial interference" with A.G.'s "sibling relationship" to Z.G. (§ 366.26, subd. (c)(1)(B)(v).) The Department does not contest that argument.

As Justice Menetrez observed, A.G. and Z.G. "have lived together for the entirety of their young lives." (*Z.G.*, *supra*, E083710 (dis. opn. of Menetrez, J.).) The record provides no reason to doubt that "ongoing contact" between the siblings would be in Z.G.'s "best interest." (§ 366.26, subd. (c)(1)(B)(v).) It is therefore at least reasonably probable that the juvenile court would have found a "compelling reason" to determine that termination of parental rights as to Z.G. would have been "detrimental" to her due to "substantial interference" with her "sibling relationship" with A.G. (*Ibid.*) We therefore reverse the termination of parental rights as to both children.

## III.

Beyond the judgment terminating her parental rights, Mother also challenges earlier orders in these proceedings through her petition for a writ of habeas corpus. This court has "long recognized habeas corpus as a vehicle for challenging child custody decisions." (*In re A.R.* (2021) 11 Cal.5th 234, 247, fn. 1 (*A.R.*).) Habeas corpus is a traditional vehicle for asserting claims of ineffective assistance of counsel, as Mother does here. (See *id.* at pp. 249, 254–255.) A parent may seek relief based on the denial of a statutory right to competent representation in a juvenile dependency proceeding. (*Id.* at p. 249; see §§ 317, 317.5.) A parent raising such a claim must show deficient performance by counsel, prejudice from that deficiency, and

"promptness and diligence" in pursuing relief. (*A.R.*, at pp. 251–253.)

Mother claims ineffective assistance of counsel on four separate grounds: (1) counsel did not object at the May 2023 disposition hearing when the juvenile court purported to terminate Mother's reunification services with A.G. and set the section 366.26 hearing; (2) counsel did not object to the children's removal; (3) counsel did not file a writ petition seeking review of the children's removal and the setting of the section 366.26 hearing; and (4) counsel did not argue a lack of statutory basis to terminate parental rights as to A.G. at the section 366.26 hearing. We conclude that counsel's failure to object when the juvenile court purported to terminate Mother's reunification services as to A.G. and set the section 366.26 hearing, as well as counsel's subsequent failure to seek writ review of the setting of the section 366.26 hearing, were ineffective assistance.

The Department and Mother agree that Mother's trial counsel was deficient in failing to raise Mother's entitlement to reunification services as to A.G. We, too, agree that the failure to raise that issue was, as the Department acknowledges, a "clear oversight." Although the Department contends that Mother was not prejudiced by the error, its rationale is that Mother would have been bypassed for reunification services — an argument we have already rejected. (See *ante*, at pp. 18–22.)

Finally, the Department asserts that Mother cannot secure relief on habeas corpus because she did not "promptly take action to set aside the dismissal of her writ proceedings." (See *A.R.*, *supra*, 11 Cal.5th at p. 258 [a parent must "diligently s[eek] relief from default within a reasonable timeframe,

considering the child's ' "unusually strong" ' interest in finality"].) But Mother promptly filed a notice of intent to file a writ petition, and her attorney concluded there were no appealable issues to raise and never filed an opening brief. The Department appears to argue that Mother should have urged her attorney to prosecute the petition anyway. "[T]hat is not the way the attorney-client relationship works. It is the attorney's role to analyze the client's legal position and suggest a strategy or recommend issues that should be explored." (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1079 (*S.D.*).) We see no basis for faulting Mother for failing to urge a petition contrary to the judgment of her attorney. Alternatively, the Department may be arguing that Mother should have filed her habeas corpus petition alleging ineffective assistance of counsel immediately after her writ petition defaulted. But that would impose an unreasonable burden on Mother. She was entitled to rely on her attorney, and there is no basis for faulting her for failing to procure independent counsel after the default, especially since she could not afford counsel and was represented by a court-appointed attorney. (See § 317, subd. (a)(1).)

Moreover, the risks of delay identified in *In re A.R.* had to do with "jeopardizing the child's long-term placement" after the time for appealing the termination of parental rights had passed. (*A.R.*, *supra*, 11 Cal.5th at p. 253.) In this case, Mother timely appealed, and the juvenile court's termination order is only final after the parent's right to appeal has been exhausted. (§ 366.26, subd. (i)(1).) Where, as here, a parent files a habeas corpus petition concurrently with a timely appeal of the termination order, her ineffective assistance of counsel claim should not be denied for lack of diligence, even if the alleged

ineffective assistance occurred at earlier stages of the dependency proceedings.

We also reject the related argument that we lack jurisdiction to hear Mother's claim of ineffective assistance of counsel relating to the termination of reunification services and the setting of the section 366.26 hearing. (See, e.g., *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1161–1163; *In re Janee J.* (1999) 74 Cal.App.4th 198, 208.) For one thing, because we have reversed the termination of parental rights on statutory error, allowing Mother's challenge to the setting of the permanency planning hearing does not "subvert the predominant interests of the child and the state in finality and reasonable expedition." (*Meranda P.*, at p. 1156.) Moreover, while the statute precludes challenges to the setting of a section 366.26 hearing except through a timely filed extraordinary writ (*Z.G.*, *supra*, E083710; see § 366.26, subd. (*l*)), counsel's deficiency effectively denied Mother "the opportunity to pursue her appeal in the first place" (*A.R.*, *supra*, 11 Cal.5th at p. 251) insofar as Mother filed a notice of intent to file a writ petition yet her counsel refused to prosecute the challenge. In such circumstances, allowing her claim is "the only meaningful way to safeguard [her] statutory right to competent representation" in dependency proceedings, and habeas corpus may offer relief in this circumstance even against "jurisdictional filing deadlines." (*Id.* at pp. 254–255.)

In sum, we hold that Mother received ineffective assistance of counsel when her trial counsel failed to assert her statutory rights to reunification services as to A.G. at the disposition hearing and on writ review of the setting of the permanency planning hearing. Accordingly, we vacate the portions of the juvenile court's May 2023 order that terminated

Mother's reunification services as to A.G. and set a section 366.26 hearing for A.G. And because services as to A.G. in all likelihood would have affected Z.G.'s trajectory given their sibling relationship, we vacate the setting of the section 366.26 hearing for Z.G. as well.

## CONCLUSION

As to Mother's direct appeal, we reverse the judgment of the Court of Appeal and remand to the Court of Appeal with directions to reverse the juvenile court's orders terminating parental rights as to Z.G. and A.G. and to remand to the juvenile court for further proceedings consistent with this opinion. As to Mother's habeas corpus petition, we vacate the juvenile court's orders terminating reunification services as to A.G. and setting a section 366.26 hearing as to both Z.G. and A.G. We direct the juvenile court to hold a new disposition hearing for Z.G. and A.G. to determine an appropriate remedy in response to claims properly presented before it, with due consideration for Mother's entitlement to reunification services with A.G. and the fact that Z.G. and A.G. "have lived together for the entirety of their young lives." (*Z.G.*, *supra*, E083710 (dis. opn. of Menetrez, J.); see, e.g., §§ 352, 366.22, subd. (a)(3), 388; *Michael G.*, *supra*, 14 Cal.5th at pp. 632–633; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016–1017.)

**LIU, J**.

**We Concur**:

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**BALTODANO, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Z.G.

_____

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 1/15/25 – 4th Dist., Div. 2
**Rehearing Granted**

_____

**Opinion Nos.** S289430, S289441
**Date Filed:**  April 27, 2026

_____

**Court:**  Superior
**County:**  San Bernardino
**Commissioner:**  Lynn M. Poncin

_____

**Counsel:**

Paul A. Swiller, under appointment by the Supreme Court, for Defendant and Appellant and for Petitioner.

Tom Bunton, County Counsel, Pamela J. Walls and David R. Guardado, Deputy County Counsel, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul A. Swiller
Attorney at Law
1901 First Avenue, Second Floor
San Diego, CA 92101
(619) 356-0848

David R. Guardado
Deputy County Counsel
385 North Arrowhead Avenue, 4th Floor
San Bernardino, CA 92415
(909) 387-7752